# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **CORTNEY R. HAWKINS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.:  2:18-cv-00638-ACA** |
| | ) | |
| **HOLY FAMILY CRISTO REY** | ) | |
| **CATHOLIC HIGH SCHOOL,** | ) | **ORAL ARGUMENT REQUESTED** |
| | ) | |
| **Defendant.** | ) | |

---

## DEFENDANT'S BRIEF IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

---

**Katie T. Powell [ASB-1047-H60T]**
**Margaret H. Loveman [ASB-6775-E60H]**
**Carol T. Montgomery [ASB-1095-J18N]**
**BUTLER SNOW LLP**
One Federal Place, Suite 1000
1819 5th Avenue North
Birmingham, Alabama 35203

*Attorneys for Defendant*

# **TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................... 1

II.    STATEMENT OF UNDISPUTED FACTS .......................................... 2

III.   ARGUMENT ...................................................................... 15

    A. Standard on Motion for Summary Judgment .................................... 15

    B. Plaintiff's Race Discrimination Claim Fails as a Matter of Law. ...... 16

        1.    Plaintiff cannot state a *prima facie* case for discriminatory termination. ........................................................... 19

            *a.* *Plaintiff cannot show there were any similarly situated teachers at Holy Family.* .................................................... 20

                i.   No proposed comparator engaged in insubordination. 20

                ii.  The proposed comparators are dissimilar in other relevant ways outlined in *Lewis.* ................................ 22

            *b.* *Plaintiff was not replaced with someone outside of her protected class.* ................................................................. 25

        2.    Plaintiff cannot establish pretext. .......................................... 26

            *a.* *The undisputed evidence shows that Plaintiff was terminated for insubordination, which is a legitimate and nondiscriminatory basis for termination.* .................. 27

            *b.* *Plaintiff cannot prove that Holy Family's articulated reasons for terminating her are pretextual.* ...................... 28

IV.    CONCLUSION ..................................................................... 31

## I.    INTRODUCTION

Plaintiff Cortney Hawkins's ("Plaintiff") Second Amended Complaint ("Complaint") arises from Holy Family's termination of her employment as a teacher. Plaintiff claims that she was terminated on the basis of her race—African American—in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1981 (2018).[1] However, the undisputed facts demonstrate that Plaintiff was terminated for insubordination, not race.

Holy Family is a member of Cristo Rey Network, a religious network of high schools that incorporate college preparatory academics and professional work experience in their curriculum. Holy Family hired Plaintiff as a history teacher on July 25, 2016. On January 12, 2018, when Plaintiff wore a jacket to school that had a zipper on the front and a hood on the back, Principal Kuyk asked her to change into more appropriate clothes and to always dress as professionally as the students.

Despite this directive, on March 8, 2018, Plaintiff wore another hooded jacket to school. Principal Kuyk asked Plaintiff to change into more appropriate clothes on three separate occasions that day. After the third time, when Plaintiff still refused to follow the directive, Principal Kuyk asked Plaintiff to go home.

---

[1]    In an order dated December 4, 2018, this Court granted in part Holy Family's motion to dismiss Plaintiff's Second Amended Complaint, dismissing all of Plaintiff's claims except her Title VII and Section 1981 race discrimination claim and stating that "[Plaintiff's] second amended complaint just barely meets th[e] [pleading] standard." *See* Doc. 36 at 14, Memorandum and Opinion Order. Discovery closed on September 2, 2019, but Plaintiff has nearly the same evidence today as she did when she filed her initial Complaint because the only discovery she issued to Holy Family was nine Interrogatories and took no depositions.

Plaintiff refused to comply with this directive as well; rather, she demanded a written explanation for her dismissal. Principal Kuyk provided this writing, but Plaintiff still refused to leave. Principal Kuyk then told Plaintiff she would have to call local authorities if Plaintiff did not leave. Plaintiff defiantly told her to call the police. Plaintiff was eventually escorted away by the police. Holy Family then terminated Plaintiff's employment for insubordination.

## II.    STATEMENT OF UNDISPUTED FACTS

### A. Holy Family Hired Plaintiff as a History Teacher.

1.      Holy Family is a high school in Birmingham, Alabama dedicated to the professional development and academic excellence of its students. (Doc. 42-1 at 15–16, 101, Deposition of Cortney Hawkins, attached as **Exhibit "A"** ("Hawkins Dep.") at 54:2–14, 56:19–57:19, Ex. 6 at p. 4). Holy Family's mission is to "integrate[] college preparatory academics and a corporate work-study program to empower students from economically challenged families to graduate high school prepared to persist in college and flourish in life." (Doc. 42-1 at 101, Ex. A, Hawkins Dep., Ex. 6 at p. 4). Students and teachers at Holy Family are expected to act respectfully, dress professionally, and uphold Holy Family's mission. (Doc. 42-2 at 3, Affidavit of Father Jon Chalmers, attached as **Exhibit "B"** ("Fr. Chalmers Aff.") at ¶ 4; Doc. 42-1 at 15–17, 110, 117, Ex. A, Hawkins Dep. at 56:19–22, 58:13–61:12, Ex. 6 at pp. 12, 19).

2.     On July 25, 2016, Holy Family hired Plaintiff as a history teacher. (Doc. 42-1 at 13, 93–95, Ex. A, Hawkins Dep. at 46:13–23, Ex. 4). Fr. Chalmers, the school's president, hired Plaintiff. (Doc. 42-2 at 3, Ex. B, Fr. Chalmers Aff. at ¶ 6; Doc. 42-1 at 12, 31, Ex. A, Hawkins Dep. at 42:14–20, 117:6–13). Plaintiff worked at Holy Family from July 25, 2016 until March 8, 2018. (Doc. 42-1 at 30, Ex. A, Hawkins Dep. at 114:4–6). Plaintiff is an African American female and was twenty-eight years old when she filed her Second Amended Complaint. (Doc. 23 at ¶ 7, Second Am. Compl.; Doc. 42-1 at 4, 42, Ex. A, Hawkins Dep. at 11:10–11, 163:9–12).

**B. Plaintiff Agreed to Follow Holy Family's Employee Policies.**

3.     Holy Family's mission is to empower students from economically challenged families. (Doc. 42-1 at 15–16, 101, Ex. A, Hawkins Dep. at 54:2–14, 56:19–57:19, Ex. 6 at p. 4). As such, it has adopted policies to protect its mission and facilitate the effective administration of the school's affairs. (Doc. 42-1 at 16–17, 101, 110, Ex. A, Hawkins Dep. at 58:13–61:11, Ex. 6 at pp. 4, 12).

4.     Teachers at Holy Family are required to follow the various policies set forth in the Holy Family Employee Handbook ("Employee Handbook"). (Doc. 42-1 at 13–14, 39, 96, Ex. A, Hawkins Dep. at 47:12–49:21, 151:19–23, Ex. 5 at ¶ 5).

5.     Plaintiff testified she received a copy of the Employee Handbook while she was employed with Holy Family and knew she was required to follow

and observe the policies set forth in the Employee Handbook. (Doc. 42-1 at 13, 15, 39, 96, Ex. A, Hawkins Dep. at 54:5–56:22, 151:16–23, 48:2–23, Ex. 5 at ¶ 5).

6.     Among the policies in the Employee Handbook is Holy Family's anti-discrimination policy, which provides in relevant part: "Holy Family prohibits discrimination by any employee (regardless of status or classification) of any other employee upon the basis of race, sex, pregnancy, national origin, religion, age, disability, and/or any other discriminatory basis prohibited by federal law." (Doc. 42-1 at 16, 105, Ex. A, Hawkins Dep. at 57:18–58:12, Ex. 6 at p. 7).

7.     The Employee Handbook also contains a "Dress Code" policy. (Doc. 42-1 at 16, 117–18, Ex. A, Hawkins Dep. at 57:18–58:12, Ex. 6 at pp. 19–20). That policy emphasizes the importance of professional dress to the Holy Family mission and provides:

> The professional appearance and conduct of faculty and staff at Holy Family have a powerful impact on relationships with students and co-workers. Students look to adults in the school as examples of how to dress and act in the business world. It is important for staff and faculty to model professionalism and respect for others with a neat, well-groomed appearance, formal business attire, and consistently courteous and positive attitude.
>
> For your reference, business dress guidelines are outlined below, including examples of inappropriate attire.

(Doc. 42-1 at 16, 117–18, Ex. A, Hawkins Dep. at 58:13–59:17, Ex. 6 at pp. 19–20). Enumerated examples of inappropriate attire include sweatpants, sweatshirts,

T-shirts, or athletic clothing. (Doc. 42-1 at 16, 118, Ex. A, Hawkins Dep. at 59:12–17, Ex. 6 at p. 20).

8.    The Employee Handbook also includes a "Standard of Conduct" policy, which specifically includes "[i]nsubordination, refusal to comply with instructions, or failure to perform reasonable duties as assigned" as conduct warranting discipline, up to and including termination. (Doc. 42-1 at 16–17, 110–11, Ex. A, Hawkins Dep. at 59:18–61:11, Ex. 6 at pp. 12–13).

### C. Plaintiff Was Insubordinate Because She Repeatedly Failed to Follow Instructions from the School's Administration.

9.    On January 12, 2018, Plaintiff wore a gray jacket to school that had a zipper in the front and a hood on the back. (Doc. 42-1 at 17, Ex. A, Hawkins Dep. at 63:11–14). Principal Kuyk emailed Plaintiff to inform her this hooded jacket was inappropriate dress: "Ms. Hawkins, [y]esterday in our meeting, we talked about teachers' professional dress. Today, you are in a sweatshirt. That is not professional dress. You should be dressed at least as professionally as the students. Thanks for your cooperation." (Doc 42-1 at 17, 123, Ex. A, Hawkins Dep. at 61:17–62:10, Ex. 7).

10.    Plaintiff testified that she "remained in the same attire" even after reading Principal Kuyk's email. (Doc. 42-1 at 17–18, Ex. A, Hawkins Dep. at 62:11–63:6, 67:13–20).

11.     Then again on March 8, 2018, Plaintiff wore another hooded jacket to school. (Doc. 42-1 at 19–20, 51, 124, 155, Ex. A, Hawkins Dep. at 72:20–73:18, 199:1–14, Ex. 8, Plaintiff's Ex. 1). At approximately 7:30 a.m., before classes started, Principal Kuyk saw Plaintiff in the hallway and asked her to remove the hooded jacket. (Doc. 42-1 at 20, Ex. A, Hawkins Dep. at 75:3–15, 76:4–11). Plaintiff did not remove it. (Doc. 42-1 at 20–21, Ex. A, Hawkins Dep. at 75:3–79:20).

12.     At approximately 7:50 a.m., after classes had begun but before Plaintiff had a class, Principal Kuyk emailed her to once again ask her to remove her jacket. (Doc. 42-1 at 21, 125, Ex. A, Hawkins Dep. at 78:5–79:12, Ex. 9).

13.     Plaintiff replied to Principal Kuyk's email and asked if she could keep the hooded jacket on because her classroom was cold and would warm up during the second school period. (Doc. 42-1 at 21, 125, Ex. A, Hawkins Dep. at 78:19–79:2, Ex. 9). Principal Kuyk replied unequivocally "no, you may not wear the hoodie." (Doc. 42-1 at 21, 125, Ex. A, Hawkins Dep. at 79:9–10, Ex. 9). Principal Kuyk then encouraged Plaintiff to get a business overcoat, which Holy Family makes available to its students, from one of the classrooms if she did not have more appropriate clothes to wear. (Doc. 42-1 at 21, 29–30, 125, Ex. A, Hawkins Dep. at 79:6–10, 112:13–113:5, Ex. 9; Doc. 42-2 at 3, Ex. B, Fr. Chalmers Aff. at ¶ 4).

14.     The professional-style overcoats that Holy Family provides for its students are also appropriate dress for the teachers and comfortably fit both teenage students and adults. (Doc. 42-2 at 3, Ex. B, Fr. Chalmers Aff. at ¶ 4). Despite Principal Kuyk's second request that Plaintiff change out of her jacket, Plaintiff once again refused. (Doc. 42-1 at 21, Ex. A, Hawkins Dep. at 79:13–16).

15.     Later in the morning of March 8, Holy Family held a department meeting in Principal Kuyk's office. (Doc. 42-1 at 22, 30, Ex. A, Hawkins Dep. at 81:11–82:3, 113:6–7). Principal Kuyk, Plaintiff, and several other teachers attended the meeting, and Plaintiff was still wearing the same hooded jacket Principal Kuyk had twice asked her to remove earlier that day. (Doc. 42-1 at 22, Ex. A, Hawkins Dep. at 83:1–9, 83:10–18).

16.     During the meeting and in front of the other teachers, Principal Kuyk asked Plaintiff to remove her jacket for a third time. (Doc. 42-1 at  22–23, Ex. A, Hawkins Dep. at 84:10–85:3; Doc. 42-3, Plaintiff's Audio Recording No. 1, March 8, 2018, attached as **Exhibit "C"** ("Plaintiff's Recording No. 1") at 1:49).[2] Instead of following instructions, Plaintiff argued with Principal Kuyk:

---

[2]     Plaintiff was not questioned about the recordings attached at Exhibits C and F or the document attached as Exhibit D during her deposition because they were not produced until after the deposition despite being responsive to Holy Family's discovery requests and within Plaintiff's possession prior to the deposition. (Doc. 42-1 at 23–24, 48–49, Ex. A, Hawkins Dep. at 86:21–89:9, 188:7–192:13). Plaintiff admitted, in response to Holy Family's Interrogatories No. 15 and 16, that she made these recordings in March 2018 and identified the name of every person whose voice is audible.

| | |
|---|---|
| Principal Kuyk: | If you are not going to take the jacket off you can go home. |
| Plaintiff: | But how is it a violation? I'm confused. |
| Principal Kuyk: | You know as well as anybody else, that you can't wear a hoodie. |
| Plaintiff: | A hoodie is a, is a [sic] is not a jacket, it has a zipper on it. A zipper, this is a jacket it is not a hoodie. |
| Principal Kuyk: | Does it have a hood? |
| Plaintiff: | Yes. |
| . . . | |
| Principal Kuyk: | And you think that is appropriate for a teacher. |
| Plaintiff: | I have been wearing this hoodie I have been wearing this jacket. |
| Principal Kuyk: | And you think that's appropriate for a teacher. |
| Plaintiff: | Yes, I do. |
| . . . | |
| Principal Kuyk: | I want you to wear a jacket that's appropriate. |
| Plaintiff: | How is this not appropriate? That's what I am trying to ask you. This is the same one that Father Bob wears. |
| . . . | |
| Principal Kuyk: | You can do what you are told to do. |
| Plaintiff: | But you don't you that [sic]. I expect you as a principal not to speak to me like that. |
| Principal Kuyk: | Right, and that's why I sent you an email. |

(Doc. 42-3, Ex. C, Plaintiff's Recording No. 1 at 1:49–2:09, 2:47–2:54, 3:34–3:42, 3:50–3:56). The department meeting proceeded after this exchange, (*id.*; Doc. 42-1 at 22, Ex. A, Hawkins Dep. at 84:10–21), but Plaintiff remained in the hooded jacket during and after the meeting. (Doc. 42-1 at 22–23, Ex. A, Hawkins Dep. at

83:16–22, 85:12–86:17, 87:11–16). The meeting ended after the third class period, and Plaintiff went to another teacher's classroom while Principal Kuyk stayed in her office for a second teacher's meeting. (Doc. 42-1 at 23, Ex. A, Hawkins Dep. at 85:12–86:17).

17.     At approximately 10:36 a.m., after three requests and Plaintiff's repeated refusal to follow instructions, Principal Kuyk texted Plaintiff and told her to go home for the remainder of the day. (Doc. 42-4 at 2, Text to Plaintiff from Kuyk, March 8, 2018, attached as **Exhibit "D"**; Doc. 42-5 at 5, Plaintiff's Response to Defendant's Request for Admission No. 3, attached as **Exhibit "E"**; Doc. 42-1 at 23–24, Ex. A, Hawkins Dep. at 86:21–87:8, 88:1–8, 89:10–13). After receiving this text, Plaintiff then went to her classroom, where she met Principal Kuyk. (Doc. 42-1 at 24, Ex. A, Hawkins Dep. at 90:19–23, 92:6–8).

18.     After confirming with Principal Kuyk that she was being sent home, Plaintiff refused to leave the school and demanded a written explanation. (Doc. 42-1 at 24–25, Ex. A, Hawkins Dep. at 90:5–18, 93:4–22). Principal Kuyk complied with this demand and drafted a memorandum detailing the reasons for Plaintiff's dismissal. (Doc. 42-1 at 25–26, 127, Ex. A, Hawkins Dep. at 95:14–22, 96:10–97:5, Ex. 11).

19.     Principal Kuyk's memorandum to Plaintiff stated:

> I asked you to take off the hoodie in the hall before school started. You did not take off the hoodie. I sent you

an email asking you to take off the hoodie. I even told you that you could get a more appropriate jacket from Ms. Cowan. You did not take off the hoodie nor did you get a more appropriate jacket.

When in my office, I told you to take off the hoodie and you refused. Therefore, you are being sent home right now, March 8, 2018 at 10:45. You are on an unpaid leave until I can meet with [Father Jon Chalmers] to discuss whether or not you will come back to [Holy Family]. You are not to be on campus until a decision is made and you are notified of the decision.

(Doc. 42-1 at 25–26, 127, Ex. A, Hawkins Dep. at 95:14–22, 96:10–97:5, Ex. 11).

20.     Principal Kuyk gave Plaintiff the memorandum and asked her to sign it so she could give Plaintiff a copy and keep a signed record for the school, but Plaintiff refused to sign it "because [she] did not agree with it." (Doc. 42-1 at 25–27, Ex. A, Hawkins Dep. at 94:1–11, 95:23–96:4, 96:19–97:9, 103:5–104:13). Plaintiff continued to demand that Principal Kuyk give her a copy of the document and refused to leave the school. (Doc. 42-1 at 27, Ex. A, Hawkins Dep. at 103:10–104:16, 104:5–16).

**D. Plaintiff Was Insubordinate When She Failed to Leave the School Property.**

21.     The series of events devolved to the point that Principal Kuyk had to call the police because Plaintiff defiantly told her "you may call the police" and would not leave the school. (Doc. 24-1 at 28, Ex. A, Hawkins Dep. at 105:3–11;

Doc. 42-6, Plaintiff's Audio Recording No. 2, March 8, 2018, attached as **Exhibit "F"** ("Plaintiff's Recording No. 2") at 10:20–10:31, 29:30–31:55).

22. The attending police officer arrived at approximately 11:10 a.m. and escorted Plaintiff out of the building after Principal Kuyk explained the situation. (Doc. 42-1 at 28–29, Ex. A, Hawkins Dep. at 107:12–17, 107:20–109:17, 110:10–16; Doc. 42-6, Ex. F, Plaintiff's Recording No. 2 at 29:35–30:35, 35:46–35:58).

23. Plaintiff, other teachers, and some students were in the front office when the police arrived and during the preceding events. (Doc. 42-1 at 28–29, Ex. A, Hawkins Dep. at 105:18–22, 109:21–110:4). According to Plaintiff, "[t]he front office is visible for everybody to see because there are windows." (Doc. 42-1 at 26, Ex. A, Hawkins Dep. at 99:1–3).

### E. Holy Family Terminated Plaintiff's Employment Because She Was Insubordinate.

24. No employee at Holy Family can be terminated without the approval of Fr. Chalmers, Holy Family's president. (Doc. 42-2 at 3, Ex. B, Fr. Chalmers Aff. at ¶ 5). After learning of these events, Fr. Chalmers made the decision to terminate Plaintiff for insubordination on March 8, 2018. (Doc. 42-2 at 3, Ex. B, Fr. Chalmers Aff. at ¶ 9; Doc. 42-1 at 25–26, 31, 130, Ex. A, Hawkins Dep. at 117:6–13, 120:10–20, 96:19–97:5, Ex. 13).

25.     On March 11, 2018 Plaintiff emailed Fr. Chalmers inquiring about her employment status. (Doc. 42-1 at 31, 131, Ex. A, Hawkins Dep. at 117:17–120:20, Ex. 14 at p. 1). Fr. Chalmers responded on March 12, 2018:

> Ms. Hawkins, I was surprised and disappointed by the accounts of the incidences involving you last Thursday morning. It [is] almost beyond my comprehension that police had to be involved. You will receive via U.S. mail a letter from the Principal terminating your employment effective March 8. [W]ith my best wishes for your future endeavors.

(Doc. 42-1 at 31, 131, Ex. A, Hawkins Dep. at 120:10–20, Ex. 14 at p. 1).

26.     Plaintiff received her termination letter, dated March 8, 2018, the following week. (Doc. 42-1 at 29, 130, Ex. A, Hawkins Dep. at 111:2–22, Ex. 13). The letter, drafted and mailed by Principal Kuyk at Fr. Chalmers's direction and with his permission, informed Plaintiff that her employment with Holy Family was terminated and stated the reasons for the termination decision:

> On March 8, 2018, you chose to wear a hoodie to school which is not in compliance with the Staff Guidelines for Professional Dress or even the student dress code. When I saw you in the hall, I asked you to remove the hoodie. You then emailed me that you wanted to keep it on because your classroom was cold. I replied that you could go to Ms. Cowan and get one of the navy jackets in her office to wear. Even though the jackets were purchased for the students, I was willing to allow you to have one so you would be more professionally dressed than you were in a hoodie. You did not get a jacket and you did not take off the hoodie. When we had the department meeting in my office, you walked in wearing the hoodie. I asked you multiple times to take it off and

you refused. I asked you to leave campus and you refused. After the meeting, I went to your classroom to tell you to leave. You were not there. So, I sent you an email telling you that you needed to go home. You came to your room and told me you wanted it in writing. I went to my office and wrote a memo to you outlining the events of the day and telling you that you would be on unpaid leave until Fr. Jon Chalmers and I had a chance to discuss your behavior. I asked you to sign the memo showing you had received a copy of it, and you refused. I even mentioned that you could write that you disagreed with the memo, however, I still needed you to sign it. You refused to sign and refused to leave. You did not leave campus until I had a Birmingham police officer escort you off the premises.

Therefore, as of March 8, 2018, your employment with Holy Family Cristo Rey Catholic High School is terminated. You may not come on campus or in the building without specific permission from either Fr. Jon or myself.

(Doc. 42-1 at 29–30, 130, Ex. A, Hawkins Dep. at 112:13–114:15, Ex. 13; Doc. 42-2 at 3, Ex. B, Fr. Chalmers Aff. at ¶ 9).

27.    After Holy Family terminated Plaintiff, it replaced her with an administrative staff employee, who is an African American female. (Doc. 42-2 at 4, Ex. B, Fr. Chalmers Aff. at ¶ 11).

**F. No Other Teachers at Holy Family Were Insubordinate.**

28.    When a teacher at Holy Family is not compliant with the dress code, the Principal will give the teacher a verbal instruction to change and to comply with the policy. (Doc. 42-2 at 4, Ex. B, Fr. Chalmers Aff. at ¶ 13).

29.     Holy Family sometimes allows teachers to wear casual clothes to celebrate special school events. (Doc. 42-1 at 17, Ex. A, Hawkins Dep. at 64:7–20).

30.     Plaintiff alleges that four white individuals are comparators:

    a. Father Bob Crossmyer, Holy Family's seventy-one-year-old Catholic priest who oversaw the school's religious instruction and the chapel. He was not on Holy Family's payroll and is a member of the religious order that previously owned Holy Family. Fr. Crossmyer was not supervised by Fr. Chalmers or Principal Kuyk, but by The Very Reverend Joe Moons, the leader of his religious order;

    b. Mrs. Cheryl Kuyk, Holy Family's Principal from June 2017 to June 2018;

    c. Mrs. Jennifer Kline, Holy Family's science teacher; and

    d. Mrs. Morgan Sargent, Holy Family's math teacher.

(Doc. 42-1 at 36–38, Ex. A, Hawkins Dep. at 138:20–139:4, 139:5–141:21, 145:4–15; Doc. 42-2 at 3–4, Ex. B, Fr. Chalmers Aff. at ¶ 10).

31.     Plaintiff admitted, however, that she does not know whether any of the four individuals were asked to comply with the dress code or to leave the school but refused. (Doc. 42-1 at 37–38, Ex. A, Hawkins Dep. at 144:2–19,

145:16–146:1, 146:17–147:2). Plaintiff also admitted that she knows of no teachers who were insubordinate to Principal Kuyk and remained employed. (Doc. 42-1 at 40, Ex. A, Hawkins Dep. at 154:12–17).

32.     Plaintiff further admitted that other teachers may have been asked to follow the dress code and obeyed instructions. (Doc. 42-1 at 52, Ex. A, Hawkins Dep. at 202:15–203:6).

33.     Since Fr. Chalmers has been the president of Holy Family, no teacher other than Plaintiff has refused to follow the dress code after receiving verbal instruction, refused to leave campus after being asked to do so, or have had the police called to escort him or her from campus other than during the March 8 incident regarding Plaintiff. (Doc. 42-2 at 4, Ex. B, Fr. Chalmers Aff. at ¶¶ 14, 15).

## III.    ARGUMENT

### A. Standard on Motion for Summary Judgment

Under *Federal Rule of Civil Procedure* 56, summary judgment is proper where the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the initial burden to show the absence of any genuine issue of material fact on the matters covered by the motion for summary judgment, but, once the moving party has sustained its burden, the burden then shifts to the nonmoving party to demonstrate by substantial evidence that genuine issues of

material fact do exist to warrant the matter being submitted to the finder of fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

For the reasons set forth below, Plaintiff cannot meet her burden, and Holy Family is entitled to summary judgment.

## B. Plaintiff's Race Discrimination Claim Fails as a Matter of Law

Plaintiff's only remaining claim from her Second Amended Complaint is that Holy Family terminated her employment because of her race in violation of Title VII and Section 1981.[3] Plaintiff's claim fails at the *prima facie* stage because she has not shown and cannot show any direct or circumstantial evidence of race discrimination.[4] Even assuming that Plaintiff could prove a *prima facie* case, her claim still fails as a matter of law because Holy Family terminated her employment for a legitimate, nondiscriminatory reason—insubordination—and Plaintiff cannot show this reason is pretextual for unlawful discrimination.

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to discriminate against an employee "because of such individual's race, color,

---

[3]    Discrimination claims brought under Title VII and 42 U.S.C. § 1981 are scrutinized under the same analytical framework. *Standard v. A.B.E.L. Servs.*, 161 F.3d 1318, 1330 (11th Cir. 1998). Therefore, an analysis of Title VII precedent will also resolve Plaintiff's discrimination claim under Section 1981.

[4]    Furthermore, this is not a mixed-motive case because, as Plaintiff admitted, she is only alleging that she was terminated because of her race, not because of a combination of a legitimate employment reason and race. *See* Doc. 42-1 at 32–33, 42, Ex. A, Hawkins Dep. at 123:4–124:3, 124:13–125:17, 163:2–16; Doc. 23 at ¶ 24, Second Am. Compl. Plaintiff's Second Amended Complaint includes two paragraphs numbered "24." This reference is to the second paragraph numbered 24.

religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (2018). In cases where the plaintiff supports her race discrimination claim with circumstantial evidence alone, courts analyze the claim using the well-known *McDonnell Douglas* framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973); *Lewis v. Union City, Ga.*, 918 F.3d 1213, 1217 (11th Cir. 2019). Under this burden-shifting framework, the plaintiff carries the initial burden of producing circumstantial evidence to make a *prima facie* case of discrimination. *Lewis*, 918 F.3d at 1217.

If the plaintiff successfully carries her burden to make a *prima facie* case, the burden of production then shifts to the defendant to come forward with a legitimate, nondiscriminatory reason for the termination decision. *Id.* Notably, this burden is "'exceedingly light.'" *Monds v. Quitman Ga.*, 767 F. App'x 750, 753 (11th Cir. 2019) (quoting *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir. 1994)). If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason, but must meet it head on and rebut it. *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1206 (11th Cir. 2013).

Once the defendant shows a legitimate, nondiscriminatory reason for its decision, the burden shifts back to the plaintiff to produce evidence to show that the "defendant's proffered reason was merely a pretext for unlawful discrimination." *Lewis*, 918 F.3d at 1221. This means that "the plaintiff must then

present concrete evidence in the form of specific facts which show that the defendant's proffered reason is mere pretext" and that "[m]ere conclusory allegations and assertions will not suffice." *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990).

The uncontroverted evidence in this case shows that Plaintiff was terminated because she was insubordinate and not because of her race. Plaintiff's own admissions paint a clear picture of insubordination in the workplace. Plaintiff admitted during her deposition that she (1) refused to comply with Holy Family's dress code policy; (2) refused to follow repeated instructions to comply with the dress code policy; (3) refused to leave school after being instructed to go home by her supervisor; (4) demanded a written explanation as a condition to leaving campus and, when given one, refused to sign it; and (5) did not leave campus until the authorities were called and escorted her out. (Doc. 42-1 at 19–20, 24–25, 28, Ex. A, Hawkins Dep. at 72:16–21, 75:3–76:11, 90:5–18, 95:14–96:9, 105:3–11). Plaintiff also admitted that this series of misconduct occurred in front of other teachers and students. (Doc. 42-1 at 26, Ex. A, Hawkins Dep. at 99:1–3). Plaintiff's behavior was especially grievous given Holy Family's mission to prepare young students to become professional adults and its reliance on teachers to set a good example. (Doc. 42-1 at 117–18, Ex. A, Hawkins Dep., Ex. 6 at pp.

19–20) (stating that "[s]tudents look to adults in the school as examples of how to dress and act in the business world.").

This Court should grant summary judgment because Plaintiff has failed to state a *prima facie* case for discriminatory termination and is unable to show that Holy Family's articulated reason for termination—insubordination—is pretextual.

1. Plaintiff cannot state a *prima facie* case for discriminatory termination.

An employee makes a *prima facie* case of race discrimination if she shows that (1) she is a member of a protected class, (2) she was qualified for the position, (3) she suffered an adverse employment action, and (4) she was treated less favorably than a similarly-situated individual outside her protected class or was replaced by a person outside her protected class. *Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dept. of Educ. ex rel. Univ. of S. Fla.*, 342 F.3d 1281, 1289 (11th Cir. 2003).

Holy Family concedes, for purposes of this summary judgment, that Plaintiff is a member of a protected class, she was qualified for the teaching position at Holy Family, and that she was terminated. However, Plaintiff's inability to bring forth any evidence to support the fourth element of her *prima facie* case is fatal to her claim. Plaintiff cannot show that she was treated less favorably than any similarly situated teacher at Holy Family or that she was replaced with an individual outside her protected class.

*a. Plaintiff cannot show there were any similarly situated teachers at Holy Family.*

To be an adequate comparator, the individual whom Plaintiff claims was treated more favorably must be "similarly situated in all material respects." *Lewis*, 918 F.3d at 1218. The Eleventh Circuit recently stated in *Lewis* that a proper comparator and the plaintiff (1) will have engaged in the same basic misconduct, (2) will be subject to the same employment policies and guidelines, (3) will be under the same jurisdiction of the same supervisor, and (4) will share the plaintiff's employment or disciplinary history. *Id.* at 1227–28. Courts focus on the employee's misconduct during a comparator analysis. *See, e.g., Menefee v. Sanders Lead Co., Inc.*, No. 19-10433, 2019 WL 4466857, at *4 (11th Cir. Sept. 18, 2019) (finding that Plaintiff and proposed comparators were not similarly situated in all material respects because they "did not engage in the same type of behavior.").

i. No proposed comparator engaged in insubordination.

Plaintiff pointed to four potential comparators during her deposition, but she offered no evidence that any of them engaged in the same insubordinate misconduct. (Doc. 42-1 at 36–37, Ex. A, Hawkins Dep. at 140:19–142:14). For Plaintiff to prove each individual is "similarly-situated," she will need to show that each was insubordinate. To prove she was "treated less favorably," Plaintiff will

need to prove each was insubordinate *but was not* terminated. Plaintiff has not done this.

Plaintiff testified she does not know whether any of the four comparators she identified in her deposition were asked to comply with the dress code policy or to leave the campus, but refused. (Doc. 42-1 at 37–38, Ex. A, Hawkins Dep. at 144:2–19, 145:16–146:1, 146:17–147:2). More importantly, Plaintiff admitted she cannot identify a single teacher who failed to follow Principal Kuyk's instructions yet remained employed. (Doc. 42-1 at 40, Ex. A, Hawkins Dep. at 154:12–17). Plaintiff even agreed that other teachers may have been asked to follow the dress code, but unlike her, obeyed the instructions. (Doc. 42-1 at 52, Ex. A, Hawkins Dep. at 202:15–203:6) ("Q: is it not possible that Ms. Kline could have been told not to do that again; therefore, on March 8th, she was not wearing jeans . . . ? A: Uh-huh, that could have been. Q: And that she obeyed . . . ? A: Yes, ma'am.").

It is undisputed that Plaintiff was asked three times by her supervisor, Principal Kuyk, to comply with the dress code policy and refused to do so, that she was told to leave campus and did not, and that she had to be escorted out of the school by the police. (Doc. 42-1 at 20–25, 28, Ex. A, Hawkins Dep. at 75:3–15, 76:4–11, 78:5–79:12, 81:11–85:2, 85:12–86:17, 86:21–87:8, 88:1–8, 89:10–91:8, 93:4–22, 105:3–107:17, 107:20–109:7). Because none of Plaintiff's proposed

comparators engaged in the same or similar misconduct as Plaintiff, they are not at all similarly situated to her "in all material respects."

      ii. The proposed comparators are dissimilar in other relevant ways outlined in *Lewis*.

Plaintiff's proposed comparators also do not support her discrimination claim because they are dissimilar in other demonstrable and relevant ways outlined by the *Lewis* court. *See Lewis*, 918 F.3d at 1227–28.

Plaintiff attempts to compare herself to Fr. Bob Crossmyer—Holy Family's then seventy-one-year-old Catholic priest—by asserting that they both wore similar hooded jackets, but she was terminated while he remained employed. However, Father Crossmyer is a member of the religious order that previously owned Holy Family and is not on the school's payroll. (Doc. 42-1 at 38, Ex. A, Hawkins Dep. at 145:4–15; Doc. 42-2 at 3–4, Ex. B, Fr. Chalmers Aff. at ¶ 10). As a Catholic priest, Fr. Crossmyer's primary obligations revolved around the school's religious activities, like religious instruction and overseeing the chapel. (Doc. 42-1 at 38, Ex. A, Hawkins Dep. at 145:1–3; Doc. 42-2 at 3–4, Ex. B, Fr. Chalmers Aff. at ¶ 10). Plaintiff, on the other hand, was a paid employee and her primary responsibilities at Holy Family were as a history teacher.

Additionally, Principal Kuyk and Fr. Chalmers did not directly supervise Fr. Crossmyer and they did not have authority over him. (Doc. 42-2 at 3–4, Ex. B, Fr. Chalmers Aff. at ¶ 10). Fr. Crossmyer's direct supervisor was his religious order's

superior, The Very Reverend Joe Moons, who also was not employed by Holy Family. (Doc. 42-2 at 3–4, Ex. B, Fr. Chalmers Aff. at ¶ 10). Principal Kuyk and Fr. Chalmers did, however, supervise Plaintiff. (Doc. 23 at ¶ 9, Second Am. Compl.; Doc. 42-2 at 3, Ex. B, Fr. Chalmers Aff. at ¶ 7). Therefore, because of their uniquely different roles, Plaintiff and Fr. Crossmyer were neither "subject to the same employment policies and guidelines," nor "under the same jurisdiction of the same supervisor." *Lewis*, 918 F.3d at 1227–28.

Plaintiff's claim that Principal Kuyk was similarly situated is not supported by the undisputed facts. Plaintiff has no summary judgment evidence that Principal Kuyk was ever insubordinate. (Doc. 42-2 at 4, Ex. B, Fr. Chalmers Aff. at ¶ 16) (stating that Fr. Chalmers was Principal Kuyk's supervisor and that she was never insubordinate). Principal Kuyk and Plaintiff also occupied materially different roles at Holy Family. Principal Kuyk was a school administrator and served as Holy Family's principal from June 2017 to June 2018, while Plaintiff was a teacher and did not have any administrative duties. (Doc. 42-2 at 3–4, Ex. B, Fr. Chalmers Aff. at ¶¶ 7, 8, 10). Because they held different positions, Principal Kuyk did not share the same duties, responsibilities, and supervision with Plaintiff.

Finally, Plaintiff alleges, without providing any support, that she was treated less favorably than Mrs. Kline and Mrs. Sargent. The evidence on which Plaintiff relies to support this allegation is her own testimony that both teachers were white

females who occasionally were out of the dress code and two pictures of unknown individual(s) wearing jeans. (Doc. 42-1 at 39–40, 144–45, Ex. A, Hawkins Dep. at 150:19–153:11, Ex. 16). This self-serving testimony is not enough to overcome summary judgment. *See Foster v. Biolife Plasma Servs.*, *LP*, 566 F. App'x 808, 811 (11th Cir. 2014) (affirming grant of summary judgment because Plaintiff's self-serving testimony was not sufficient to meet her burden).

First, even if Mrs. Kline or Mrs. Sargent had been out of dress code, there is no evidence that (1) Principal Kuyk failed to ask them to comply or (2) that they refused to comply. Plaintiff even testified that it was possible that Mrs. Kline had been directed to follow the dress code and did so. (Doc. 42-1 at 52, Ex. A, Hawkins Dep. at 202:15–203:6) ("Q: is it not possible that Ms. Kline could have been told not to do that again; therefore, on March 8th, she was not wearing jeans . . . ? A: Uh-huh, that could have been. Q: And that she obeyed . . . ? A: Yes, ma'am.").

Second, the pictures provided by Plaintiff do not show the individual's face, the time of day, or the location. She also could not show that they wore casual clothes during a time when it was inappropriate to do so. After all, Plaintiff admitted there were special days at Holy Family when teachers were permitted to wear casual clothes to school. (Doc. 42-1 at 17, Ex. A, Hawkins Dep. at 64:7–20). Plaintiff also did not bring any evidence to show that she and these two teachers

had a similar employment or disciplinary history. Even if this Court were to assume for purposes of this Motion that the pictures did depict teacher(s) at Holy Family during the school day in violation of the dress code, Plaintiff has no evidence that Principal Kuyk was aware of the dress code infraction. More importantly, she has no evidence that they repeatedly failed to comply with any directive by Principal Kuyk to abide by the dress code.

Because none of Plaintiff's proposed comparators engaged in the same misconduct, and each was either subject to different employment policies, under the jurisdiction of different supervisors, or did not share Plaintiff's disciplinary history, none of them are adequate comparators. Plaintiff, therefore, cannot make a *prima facie* case for race discrimination and her claim fails as a matter of law.

> b. *Plaintiff was not replaced with someone outside of her protected class.*

Plaintiff is also unable to show she was replaced with someone outside of her protected class. After Plaintiff's termination, an African American female who was a member of the administrative staff took over Plaintiff's position at Holy Family. (Doc. 42-2 at 4, Ex. B, Fr. Chalmers Aff. at ¶ 11). Plaintiff is an African American female. (Doc. 23 at ¶ 7, Second Am. Compl.; Doc. 42-1 at 42, Ex. A, Hawkins Dep. at 163:9–12). Therefore, Plaintiff was not "replaced by a person outside her protected class." *Maynard*, 342 F.3d at 1289.

Because Plaintiff has no concrete evidence to show that (1) she had an adequate comparator or that (2) she was replaced with an individual outside her protected class, she has failed to establish a *prima facie* case of race discrimination. Therefore, Plaintiff's claim fails as a matter of law, and this Court should grant summary judgment on that basis.

2. Plaintiff cannot establish pretext.

To show pretext, the plaintiff must demonstrate "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find [all of those reasons] unworthy of credence.'" *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1333 (11th Cir. 1998) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (internal citations omitted) (alteration in original)). If the plaintiff does not proffer sufficient evidence to create a genuine dispute of material fact regarding whether each of the employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claims. *Standard*, 161 F.3d at 1333. In the end, "the plaintiff always bears the ultimate burden of proving discriminatory treatment by a preponderance of the evidence." *Earley*, 907 F.2d at 1081.

Holy Family has articulated a legitimate, nondiscriminatory reason for terminating Plaintiff's employment—insubordination. Plaintiff has no evidence

that this reason is pretextual for race discrimination. Therefore, even were Plaintiff able to make a *prima facie* case, her claim also fails as a matter of law under the second and third prongs of the *McDonnell Douglas* framework.

> a. *The undisputed evidence shows that Plaintiff was terminated for insubordination, which is a legitimate and nondiscriminatory basis for termination.*

Plaintiff testified that she received and read a copy of the Employee Handbook and agreed in her contract with Holy Family to observe all the policies of Holy Family. (Doc. 42-1 at 13, 39, 96, 100, Ex. A, Hawkins Dep. at 48:2–23, 151:16–23, Ex. 5 ¶ 5, Ex. 6 at p. 2). The Employee Handbook includes Holy Family's employment and disciplinary policies. For example, the section on "Standards of Conduct" provides that employees may be subject to disciplinary action, including termination, for *insubordination*, *refusal to comply with instructions*, or failure to perform reasonable duties as assigned. (Doc. 42-1 at 15–17, 110–11, Ex. A, Hawkins Dep. at 54:5–14, 59:18–61:12, Ex. 6 at pp. 12–13) (emphasis added).

Despite Plaintiff's familiarity with Holy Family's policies and her concomitant responsibility to adhere to them, she engaged in five specific acts of insubordination on the date of her termination. Plaintiff admitted that she:

(1) refused to comply with Holy Family's dress code policy;

(2) refused to follow Principal Kuyk's repeated instructions to comply with the dress code policy;

(3) refused to leave school after being told to go home for the day;

(4) demanded a written explanation as a condition to leaving campus and, when given one, refused to sign it; and

(5) did not leave the school until the authorities were called and escorted her out.

(Doc. 42-1 at 19–20, 24–25, 28, Ex. A, Hawkins Dep. at 72:16–21, 75:3–76:11, 90:5–18, 95:14–96:9, 105:3–11). Plaintiff also admitted most of these events occurred in front of other teachers and students either in the hallway, the teachers' department meeting, or in the front office where it is "visible for everybody to see because there are windows." (Doc. 42-1 at 26, Ex. A, Hawkins Dep. at 99:1–3). As a result of these events, Holy Family terminated Plaintiff's employment effective March 8, 2018. This evidence is sufficient to establish Holy Family's legitimate, nondiscriminatory reason for Plaintiff's termination—insubordination. (*See* Section II.C–E, Statement of Undisputed Facts at ¶¶ 9–26, *supra*).

> b. *Plaintiff cannot prove that Holy Family's articulated reasons for terminating her are pretextual.*

Plaintiff has not presented any "concrete evidence in the form of specific facts" to recast Holy Family's stated reasons as pretextual, *Earley*, 907 F.2d at 1081, and her claims remain merely conclusory. *Id.* Principal Kuyk's good faith

belief that Plaintiff was violating the dress code policy, along with evidence that Fr. Chalmers both hired and terminated Plaintiff, foreclose Plaintiff's ability to show pretext.

Plaintiff's contention that she was not violating Holy Family's dress code policy and, therefore, was justified in refusing to change into something more appropriate fails to establish pretext and is flawed for two reasons. First, Plaintiff was terminated for insubordinate behavior originating from her violation of the dress code policy. *See* Section III.B.2.a, *supra*.

Second, Plaintiff's contention that Principal Kuyk was wrong about the dress code policy is irrelevant. Title VII and Section 1981 do not require employers to make immaculate employment decisions. All that is required from the employer is a good faith belief that the employee engaged in misconduct. *E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1176 (11th Cir. 2000); *Entrekin v. Panama City, Fla.*, 376 F. App'x 987, 997 (11th Cir. 2010) (holding that the employer had a good faith belief that the employee had been insubordinate during work training). Courts do not sit as a super-personnel department second-guessing an employer's decision. *Beckles v. Fed. Exp. Corp.*, 489 F. App'x 380, 384 (11th Cir. 2012).

Here, the evidence shows that Principal Kuyk believed, in good faith, that what Plaintiff wore on March 8, 2018 did not conform to the school's dress code policy. (Doc. 42-1 at 19–21, 27, 124, 155, Ex. A, Hawkins Dep. at 72:20–73:21,

76:22–77:22, 78:11–80:18, 102:9–21, Ex. 8, Plaintiff's Ex. 1). Therefore, Plaintiff's argument that she "felt like" her outfit complied with the dress code policy does not establish pretext. (Doc. 42-1 at 53, Ex. A, Hawkins Dep. at 207:4–8).

Finally, the same actor inference also informs a finding that Holy Family's articulated reason is not pretextual. Generally, when "the facts indicate that the same individual both hired and fired an employee, an inference may arise that the employers' stated justification for terminating the employee is not pretextual." *Williams v. Vitro Servs. Corp.*, 144 F.3d 1438, 1442 (11th Cir. 1998) (citing the presumption that arises in other circuits when same actor evidence is presented). In the Eleventh Circuit, evidence that the same person both hired and terminated an employee "may give rise to a permissible inference that no discriminatory animus motivated [the employer's] actions." *Id.* Therefore, evidence that the same actor hired and terminated an employee can show that the stated termination decision is not pretextual but is, in fact, legitimate and nondiscriminatory.

The uncontroverted evidence here, as supported by Plaintiff's testimony, shows that Fr. Chalmers hired Plaintiff on July 25, 2016 and terminated her on March 8, 2018. (Doc. 42-1 at 12, 25–26, 31, 127, 130–31, Ex. A, Hawkins Dep. at 42:6–16, 96:10–97:5, 117:6–13, Ex. 11, Ex. 13, Ex. 14 at p. 1; Doc. 42-2 at 3, Ex. B, Fr. Chalmers Aff. at ¶¶ 5, 6, 9). It is unlikely that Fr. Chalmers hired Plaintiff,

knowing she was African American, only to soon thereafter develop racial animus and terminate her on the basis of her race. Instead, this evidence supports Holy Family's position that it terminated Plaintiff for a legitimate reason—insubordination—and Plaintiff can proffer no evidence to rebut this as pretextual for unlawful discrimination.

Because Holy Family has met its "exceedingly light" burden to show a legitimate, nondiscriminatory reason for terminating plaintiff, and because Plaintiff has not shown that this reason is filled with such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" as to be pretextual, her claim fails as a matter of law. *Monds*, 767 F. App'x at 753 (quoting *Turnes*, 36 F.3d at 1061); *Standard*, 161 F.3d at 1333 (quoting *Combs*, 106 F.3d at 1538).

## IV.    CONCLUSION

For the foregoing reasons, there is no genuine dispute of material fact and Holy Family is entitled to judgment as a matter of law.

**WHEREFORE, PREMISES CONSIDERED**, Holy Family respectfully moves this Court to grant its Motion for Summary Judgment on Plaintiff's Title VII and Section 1981 claims against it.

**Respectfully submitted this the 13th day of November, 2019.**

<div style="margin-left: 45%;">

**/s/ Katie T. Powell**

**Katie T. Powell [ASB-1047-H60T]**
**katie.powell@butlersnow.com**
**Margaret H. Loveman [ASB-6775-E60H]**
**margaret.loveman@butlersnow.com**
**Carol T. Montgomery [ASB-1095-J18N]**
**carol.montgomery@butlersnow.com**

</div>

**OF COUNSEL:**
**BUTLER SNOW LLP**
One Federal Place, Suite 1000
1819 5th Avenue North
Birmingham, Alabama 35203
Telephone:  (205) 297-2200
Facsimile:   (205) 297-2100

*Attorneys for Defendant*

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served on all parties to this action by e-file using the Court's CM/ECF system, electronic mail and/or by depositing a copy of the same in the U.S. Mail, first-class postage prepaid and properly addressed as follows:

Ida Tyree Hyche
**TYREE HYCHE & DIXON, LLC**
2025 3rd Avenue North, Suite 200
Birmingham, Alabama 35203
Telephone: (205) 777-5220

*Attorney for Plaintiff.*

**Done this the 13th day of November, 2019.**

**/s/ Katie T. Powell**
**OF COUNSEL**

50130939.v1